**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE COCA-COLA COMPANY & SUBSIDIARIES,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 03-1155 T** |
| **v.** | ) | **The Honorable Lawrence J. Block** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**EXHIBIT A**
**TO DEFENDANT'S PROPOSED FINDINGS**
**OF UNCONTROVERTED FACT**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE COCA-COLA COMPANY & SUBSIDIARIES,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 03-1155 T** |
| **v.** | ) | **The Honorable Lawrence J. Block** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF CONNIE STEGEN McDONALD**

I, Connie Stegen McDonald, make the following declaration:

1. I am currently employed as a lead tax examiner with the Internal Revenue Service. I work in the Case Processing Department, Exam Field Support Operations, Ogden Compliance Services, Small Business and Self Employed Service Centers. I have worked for the Internal Revenue Service 24 years. I began my career in the Collections Branch as a clerk. Two years later I moved to the Examination Branch as a tax examiner. I worked as a tax examiner in the Correspondence Exam unit and the TEFRA Report Writing unit as well. In May 1994 I was selected as a restricted interest tax examiner in the Perfection Unit and I have been working restricted interest accounts for the past 12 years. During this time I attended Beginning, Intermediate and Advanced Restricted Interest Training. From 2000 through October 2001 I was in the Quality Review unit. My main responsibility was to review the work from the restricted

interest examiners in the Perfection unit. In November 2001 I worked with TIGTA on a program reviewing accounts with large overpayments that required manual refunds involving restricted interest. In February 2002 I became a lead tax examiner in the Perfection unit. My responsibilities involved coaching and on the job instructing tax examiners with restricted interest computations. I completed the monthly review of the work generated from the tax examiners which involved restricted interest computations. In February 2003 I began instructing Beginning, Intermediate and Advance Restricted Interest classes. In 2003 I attended the Net Rate Netting Interest class. From 2004 to the current date I continue to instruct the Intermediate, Advanced and Net Rate Netting Interest classes. I perform the Quality Review of the work generated from the tax examiners in my unit. As a lead tax examiner I review the Net Rate Netting interest cases worked by the employees in the Case Processing Department. I continue to work my own inventory which involves complex, restricted interest cases as well a Net Rate Netting claims. I coach the tax examiners of the Case Processing department on their restricted interest case work.

2. My duties require me to review and interpret taxpayer records maintained by the Internal Revenue Service including, but not limited to, transcripts of account.

3. In preparing this declaration, I have reviewed all of the submissions made by plaintiff in support of its motion for summary judgment, including plaintiff's brief, plaintiff's proposed findings of fact, the affidavit of Francine Silverman, and all of the various documents, schedules and computations associated with them. I have also reviewed the stipulation of facts filed by the parties, and the petition (with exhibits) to the

United States Tax Court, filed by Coca-Cola Company on August 1, 1991, and assigned Docket No. 17171-91.

4. In addition, I have in my possession certain administrative files of the Internal Revenue Service which include documents pertaining to the various adjustments, computations and the like with respect to plaintiff's 1981 taxable year, as well as other years which are relevant to determining plaintiff's income tax liability for 1981, and the computation of interest thereon.

5. Taxpayer timely (pursuant to an extension) filed its income tax return with respect to calendar 1981 on or about September 13, 1982.

6. The return reported a tax liability of $89,332,282, not all of which had been paid when due, on March 15, 1982.

7. After adjustments reducing the tax liability by $119,636, and payment of underpayment interest of $145,946.68 in September, 1983, and $70,085.60 in April, 1984, the account balance for the plaintiff's 1981 income tax year became zero.

8. In November, 1984, taxpayer filed a Form 1139, "Corporation Application for a Tentative Refund," seeking a refund of 1981 income tax of $7,606,600, based on carrybacks from 1983.

9. This refund was paid within 45 days of the date of the claim, without interest.

10. In January, 1985, taxpayer filed yet another Form 1139, seeking a carryback refund of 1981 income tax of $1,114,752, based on carrybacks from 1984.

11. This refund was paid within 45 days of the claim, without interest.

12. On September 16, 1985, plaintiff filed a third Form 1139, this time seeking a refund of 1981 income tax of $18,682,973, generated by additional carrybacks to 1981 from 1984.

13. This refund was paid on September 27, 1985, within 45 days of the filing of the claim, without interest.

14. Coca-Cola's 1981 income taxes had been under audit since June of 1983.

15. In October of 1987, the Internal Revenue Service assessed a tax deficiency in the amount of $8,191,826, along with deficiency interest in the amount of $7,802,895 (for a total of $15,994,721) for income tax year 1981.

16. The deficiency consisted of general adjustment increasing plaintiff's taxes by $8,967,196, and allowance of an additional carryback to 1981 from 1982, decreasing plaintiff's 1981 tax in the amount of $775,370.

17. This tax deficiency and the deficiency interest was satisfied by plaintiff with a payment of $15,994,721 on October 27, 1987.

18. In January of 1990, the Commissioner commenced an audit of plaintiff's 1981 income tax liability, which reviewed, among other things, the amount and correctness of the carrybacks from 1984 to 1981.

19. The examination resulted in a net tax assessment of $9,772,827, which was comprised of three parts. First, there was a general adjustment *reducing* plaintiff's tax liability by $952,336. Second, there was an increase in the amount of the carryback allowed from 1983 to 1981, resulting in a tax *decrease* of $1,722,916. Finally, there

was a reduction in the amount of the carryback allowed to 1981 from 1984, resulting in a tax *increase* of $12,448,079.

20. This tax deficiency, along with deficiency interest of $3,780,718.70, was assessed on January 23, 1991.

21. This deficiency was satisfied by transferring into the account an overpayment credit from 1980 in the amount of $986,054.19, another overpayment credit from 1980 in the amount of $712,094.04 (which had been paid on October 27, 1987), and an overpayment credit from 1984 in the amount of $11,855,397.47 (which had been paid on March 15, 1990). These last two amounts ($712,094.04, originally paid with respect to 1980, and $11,855,397.47, originally paid with respect to 1984) would later be transferred out of the account (and applied to plaintiff's tax liability for 1982) when the Service's deficiency assessment was almost entirely reversed, as set out below.

22. On May 30, 1991, the Commissioner issued a Notice of Deficiency with respect to plaintiff's taxes for 1981, 1983 and 1984.

23. The Notice proposed various substantive adjustments to plaintiff's taxes for 1983 and 1984, and affected the year in issue, 1981, only insofar as those adjustments to 1984 reduced carrybacks which plaintiff had claimed (and been allowed) from 1984 to 1981.

24. On that basis, it proposed a deficiency in tax with respect to 1981 in the amount of $6,234,894.

25. Taxpayer filed a petition for a redetermination with the United States Tax Court.

26. The resolution of the dispute was embodied in a stipulated decision of the Tax Court, dated January 2, 1997, which determined that there was an overpayment of tax with respect to 1981 in the amount of $12,352,648, which had been paid on October 27, 1987 and March 15, 1990 (the dates of the payments of the amounts that had been credited to plaintiff's 1981 account as credits from 1980 and 1984, referred to above, used to satisfy the deficiency).

27. The overpayment resulted entirely from reversal of virtually all of the carryback recapture.

28. Taxpayer originally claimed (and was allowed a refund) of $18,682,973 as the result of carrybacks from 1984 to 1981.

29. The Service later disallowed $12,448,079 of that amount.

30. The stipulated Tax Court decision reflected the agreement of taxpayer and the Commissioner that the Commissioner's reversal (recapture) of $12,448,079 of the carryback from 1984 to 1981 was in error to the extent of $12,352,648, resulting in an overpayment in that amount.

31. This adjustment also resulted in the abatement of previously assessed deficiency interest in the amount of $5,531,965.47, for a total overpayment of $17,884,613.47.

32. The overpayment was applied as a credit against plaintiff's 1982 corporate income tax liability on or about May 25, 1997.

33. The plaintiff's 1981 income tax account, as finally adjusted, showed an interim overpayment of $11,039,447.06 between March 15, 1985 and September 27, 1985.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct. Executed in Ogden, Utah, on September 13, 2006.

s/ Connie Stegen McDonald
CONNIE STEGEN McDONALD
LEAD TAX EXAMINER